SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION, RAIL SERVICES PLANNING OFFICE, Respondent,

Consolidated Rail Corporation, Intervenor.

Nos. 78–2345, 80–1237.

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 1980.*

Decided March 12, 1981.

As Amended May 14, 1981.

Ninth Circuit's prohibition of discipline under Subsection 1.

* Assigned October 15, 1980 following submission of additional data by counsel.

Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, Andrea Limmer, Dept. of Justice, Washington, D. C., Alexander L. Morton, Director, Interstate Commerce Commission, Washington, D. C., Richard A. Allen, Gen. Counsel, Henri F. Rush (argued), Associate Gen. Counsel, Ellen K. Schall, Interstate Commerce Commission, Washington, D. C., for respondent, Interstate Commerce Commission, Rail Services Planning Office.

Lewis H. Van Dusen, Jr. (argued), Henry S. Hilles, Jr., John Chesney, Drinker, Biddle & Reath, Philadelphia, Pa., for petitioner, Southeastern Pennsylvania Transportation Authority.

Donald A. Brinkworth (argued), Patricia A. Godfrey, Philadelphia, Pa., for intervenor, Consolidated Rail Corporation.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

This petition for review concerns an issue arising under the cost allocation Standards promulgated by the Rail Services Planning Office (RSPO) of the Interstate Commerce Commission (ICC).[1] The relevant statutes and regulations are the Regional Rail Reorganization Act of 1973, Pub.L.No.93–236, 87 Stat. 985, (3R Act) *as amended by* the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No.94–210, 90 Stat. 31, (4R Act) [sometimes jointly referred to as the "Rail Act"],[2] and the Standards for Determining Commuter Rail Service Con-

---

1. The appeal in this matter was consolidated for briefing and disposition with the appeal in *Southeastern Pennsylvania Transportation Authority v. ICC*, No. 77–2520 (*SETPA II*), on the unopposed motion of petitioner SEPTA. Although the legislative background underlying both appeals is similar, the appeals present distinct and unrelated legal issues. Accordingly, that portion of the order consolidating the

appeals for disposition on the merits is vacated. The opinion in *SEPTA II* is also being filed today.

2. The 4R Act both added sections to the 3R Act and amended others. The resulting legislation is often referred to as the Rail Act, although there is no single piece of legislation by that name. In referring to specific sections of the legislation, the parties generally refer to the

tinuation Subsidies, 49 C.F.R. § 1127 (1979), *as amended by*, 45 Fed.Reg. 45 (1980) (the Standards).

The within petition for review has been filed by the Southeastern Pennsylvania Transportation Authority (SEPTA), a public authority organized in corporate form pursuant to a Pennsylvania statute, the Metropolitan Transportation Authorities Act of 1963, Pa.Stat.Ann. tit. 66, §§ 2001–2043 (Purdon Supp.1980). SEPTA is responsible for the development and operation of a transportation system in the Philadelphia metropolitan area, including the provision of commuter rail service. Prior to the creation of Conrail from the properties of the insolvent Northeastern railroads, SEPTA had provided commuter rail services by contracting for them with the Pennsylvania (later the Penn Central) and Reading Railroads or, in the period immediately before Conrail's establishment, the railroads' trustees in bankruptcy. Following

the enactment of the Rail Act, SEPTA opted to continue to fund the commuter rail services; accordingly it offered and currently pays rail service continuation payments to Conrail. Conrail, in turn, has continued to operate commuter rail service in the area.

■ The issue raised by SEPTA's petition relates to the appropriate allocation of certain costs between SEPTA and Conrail. Conrail has intervened in this appeal.[3]

## II.

## GENERAL BACKGROUND OF RAIL REORGANIZATION

It may be useful to begin with a brief review of the background of Congress' recent rail legislation. By the early 1970's eight major railroads in the Midwest and Northeast region of the United States were insolvent and threatened with cessation.

section of the original act, rather than to the codified statutory section after amendment. For purposes of consistency we will use the section number of the original statute and append the appropriate codified citation which will, of course, incorporate any amendments to the original version. It should be noted that *some sections* of the 3R Act which were amended by the 4R Act were repealed and reenacted without substantive change by the Revised Interstate Commerce Act, Pub.L.No. 95–473, §§ 1, 4(b), 92 Stat. 1337, 1466 (1978), in order to recodify the sections in title 49 of the United States Code.

3. RSPO filed a motion to dismiss for lack of jurisdiction the appeal in this case and the companion case decided today, *SEPTA v. ICC,* 644 F.2d 253 (3d Cir. 1981). It contends that there is no statutory authority for direct review of RSPO orders by the courts of appeals and, therefore, SEPTA must seek relief in the district courts pursuant to 5 U.S.C. § 704 (1976). SEPTA alleges that jurisdiction exists under the Administrative Orders Review Act of 1950 (the Hobbs Act), which invests the courts of appeals with exclusive jurisdiction "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . (5) all rules, regulations, or final orders of the Interstate Commerce Commission . . . ." 28 U.S.C. § 2342 (1976). The issue is whether final orders or regulations of the RSPO are to be considered orders or regulations of the Interstate Commerce Commission.

Specific statutory language establishes the RSPO as "an office in the Interstate Commerce

Commission." 49 U.S.C. § 10361 (Supp. III 1979). The director of the RSPO is subject to the direction of and must report to an ICC Commissioner, and may be removed "for cause" by the Commission. *Id.* § 10363. Additionally, both the Federal Register and the Code of Federal Regulations classify pronouncements of the RSPO under the heading of the ICC. The regulations which are the subject of these appeals appear in the Federal Register as issued by the Director of the RSPO, with the subsequent notation "By the Commission. Robert L. Oswald, *Secretary*." *See, e. g.,* 41 Fed.Reg. at 32546, 32554 (1976). SEPTA also points to the RSPO's use of ICC stationery in its official correspondence.

Although Congress gave to the RSPO final administrative responsibility for certain determinations, we conclude that the RSPO is sufficiently part of the ICC so that its orders are to be considered orders of the ICC for purposes of the Hobbs Act. In the absence of any evidence of contrary intention by Congress, we see no reason why RSPO orders should require district court review if ICC orders do not. We also note that in the one other case cited by the parties where RSPO regulations were at issue, the Court of Appeals for the District of Columbia affirmed its jurisdiction to consider the validity of RSPO regulations under the Hobbs Act, apparently without any challenge by the RSPO. *Pennsylvania v. ICC,* 535 F.2d 91, 93 (D.C.Cir.), *cert. denied,* 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976).

Congress recognized that rail transportation problems were "approaching crisis proportions" and could result in "drastic consequences throughout the United States," S.Rep.No.601, 93d Cong., 1st Sess. 7–8, *reprinted in* [1973] U.S.Code Cong. & Ad. News 3242, 3248. Congress embarked on a series of steps to help restore the railroad system of the United States.

In 1970, Congress enacted the Rail Passenger Service Act, 45 U.S.C. §§ 501–645 (1976), which created the National Railroad Passenger Corporation, a "for profit corporation" known as Amtrak. This statute was directed to the problems of intercity passenger service. Railroads which entered into contracts with Amtrak were relieved of their obligations to provide intercity passenger service as of May 1, 1971, and Amtrak was required to operate passenger trains within the "basic system." *See* H.R.Rep. No.1580, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 4735.

In 1973, Congress enacted the Regional Rail Reorganization Act (the 3R Act) in an effort to reorganize the bankrupt railroads.[4] The statute created three new entities. First, the United States Railway Association, a new government corporation, was formed to "engage in the preparation and implementation of the final system plan." 3R Act, §§ 201, 202(a)(1), *currently codified at* 45 U.S.C. §§ 711, 712(a)(1) (1976).[5] The Final System Plan was envisioned as a "basic document which will identify the necessary rail services in the Midwest and Northeast region and propose needed restructuring, rehabilitation, and modernization." S.Rep.No.601, 93d Cong., 1st Sess. 25, *reprinted in* [1973] U.S.Code Cong. & Ad. News 3242, 3265. Although the 3R Act established eight goals which the Final System Plan was to effectuate, Congress identified the "two basic goals," *id.*, as "(1) the creation, through a process of reorganiza-

tion, of a financially self-sustaining rail service system in the region; [and] (2) the establishment and maintenance of a rail service system adequate to meet the rail transportation needs and service requirements of the region." 3R Act, § 206(a)(1), (2), *currently codified at* 45 U.S.C. § 716(a)(1), (2). The Final System Plan was also required to designate, *inter alia*, which rail properties of the bankrupt railroads were to be transferred to the Consolidated Rail Corporation (Conrail); which properties were to be offered for sale to profitable railroads in the Midwest and Northeast region; and which properties were to be available for purchase or lease from Conrail by a state or a local or regional transportation authority to meet the needs of commuter rail passenger service. 3R Act, § 206(c)(1)(A), (B), (D), *currently codified at* 45 U.S.C. § 716(c)(1)(A), (B),(D) (1976). The Railway Association was obliged to submit the Final System Plan to Congress. 3R Act § 208(a), *currently codified at* 45 U.S.C. § 718(a) (1976). When the Final System Plan was submitted to Congress on July 26, 1975, neither house exercised its statutory opportunity to disapprove it, and it was therefore deemed approved. *Id.*

The 3R Act also established the Rail Services Planning Office (RSPO), a party to the instant litigation. The duties of the RSPO set forth in the 3R Act included the evaluation of reports by the Secretary of Transportation concerning rail services in the region; representation of communities and rail service users who would otherwise be inadequately represented in the service evaluation process necessitated by the Act; publication of standards for the definition of accounting terms used in section 304 of the 3R Act; and assistance to states or transportation authorities in determining whether to provide rail service continuation subsidies to continue the operation of cer-

---

4. The scheme of the 3R Act is considered in some detail in Regional Rail Reorganization Act Cases, 419 U.S. 102, 108–17, 95 S.Ct. 335, 341–345, 42 L.Ed.2d 320 (1974). The issues involved there related to the remedies available to the estates of the railroads for the rail properties compelled to be transferred to Conrail

under § 303 of the 3R Act, 45 U.S.C. § 743(b) (1976).

5. The rationale for the creation of a new entity to fulfill this task is discussed in Hillman, *The Making of Conrail*, 45 ICC Prac.J. 18, 19 (1977).

tain rail services. 3R Act, § 205, *currently codified at* 49 U.S.C. § 10362 (Supp. III 1979).

Finally, the 3R Act created the Consolidated Rail Corporation (Conrail), a for-profit corporation, which was intended to provide continued freight service and which was authorized to acquire rail properties designated by the Final System Plan to be transferred to it; operate and maintain adequate and efficient rail service as required by the 3R Act; and rehabilitate and modernize its rail properties. 3R Act, §§ 301, 302, *currently codified at* 45 U.S.C. §§ 741, 742 (1976).

The 3R Act attempted to resolve one of the problems that had plagued the now bankrupt railroads by enabling Conrail to discontinue obsolete or unprofitable rail services without first securing the permission of the ICC. The statute provided a more expeditious procedure by which large portions of rail lines in the Northeast and Midwest designated as unnecessary in the Final System Plan could be abandoned or discontinued, 3R Act § 304(a), *currently codified at* 45 U.S.C. § 744(a) (1976 & Supp. III 1979). *See Illinois v. Consolidated Rail Corp.*, 589 F.2d 1327 (7th Cir. 1978), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2884, 61 L.Ed.2d 312 (1979). *See also* discussion in Johnson, *The Railroad Revitalization and Regulatory Reform Act of 1976*, 45 ICC Prac.J. 27 (1977). Although the rail service continuation program primarily affected freight lines, Conrail's predominant business, some of the insolvent railroads which conveyed rail lines to Conrail under the Final System Plan had also previously provided commuter services under contracts with state and local transportation authorities. Congress was aware that discontinuation of these services would cause employment and environmental disruption in many communities. S.Rep.No.601, 93d Cong., 1st Sess. 37, *reprinted in* [1973] U.S.Code Cong. & Ad.News 3242, 3277. To alleviate these problems the 3R Act obliged Conrail to provide commuter rail services if states or local transportation authorities made rail service continuation payments to subsidize these desired, but unprofitable, rail services. 3R Act, § 304, *currently codified at* 45 U.S.C. § 744 (1976 & Supp. III 1979).

While the restructuring mandated by the 3R Act was in progress, it became evident that the financial problems of the bankrupt railroads were not confined to the Northeast and Midwest region. Accordingly, in 1976, Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No.94–210, 90 Stat. 31, which amended the 3R Act so as to accomplish on a national scale much of what the 3R Act provided for the Northeast and Midwest region and which also made certain substantive changes to the underlying legislation. *See generally* Adams, *Railroad Revitalization and Regulatory Reform Act of 1976—An Interim Review*, 32 Bus.Law 975 (1977). The RSPO, which had been conceived as a temporary office by the 3R Act, was established as a permanent office and given additional designated responsibilities. 4R Act, § 309, *currently codified at* 49 U.S.C. § 10361 (Supp. III 1979).

Pursuant to this national scheme, properties of the bankrupt railroads were conveyed to Conrail on April 1, 1976. On the same day, it transferred to Amtrak main line and certain contiguous rail properties in the Northeast Corridor but retained operating easements for its freight service and for its operation of subsidized commuter passenger service. Under a management agreement between Conrail and Amtrak, Amtrak undertook maintenance of way and accounting and record keeping responsibilities pertaining to the Northeast Corridor properties. Issues between Conrail and Amtrak do not enter into the litigation before us.

### III.

### COMMUTER RAIL SERVICE

The Final System Plan earmarked thirteen commuter rail services in the Northeast and Midwest Region for discontinuance. Under the requirement set forth in the Rail Act, Conrail was required to operate these commuter services for 180 days

after April 1, 1976.[6] Thereafter, Conrail was required to continue those services if the local governments or authorities offered to pay the required subsidy. Under provisions of both the Rail Act and the Urban Mass Transportation Act of 1964, the Urban Mass Transportation Authority was required to reimburse Conrail and the local bodies or agencies for their entire losses incurred during the 180 day mandatory operation period, which ran from April 1 to September 27, 1976. Congress also authorized federal emergency operating assistance to sustain the continuing operations over a two and a half year period until September 27, 1978. The RSPO was instructed to develop Standards for computing subsidies to be paid by the local authority and to determine the emergency operating payments.

It formulated the Standards for computation of subsidies through the rulemaking process during which the RSPO revised its proposals in response to comments received from interested parties.[7] The current version of the Standards appear at 49 C.F.R. Part 1127.[8] In essence the Standards implement section 304(c)(2)(A) of the 3R Act, as amended, central for purposes of this case, which provides that Conrail may not discontinue service

> if a financially responsible person (including a government entity) offers—
> (A) to provide a rail service continuation payment which is designed to cover the difference between the revenue at-

tributable to such rail properties and the avoidable costs of providing rail service on such properties, together with a reasonable return on the value of such properties.

45 U.S.C. § 744(c)(2)(A) (1976). The statute expressly gives the RSPO responsibility for defining the key phrases, "revenue attributable to the rail properties", the "avoidable cost of providing service", and a "reasonable return on value", as those phrases are used in Section 304 of the Act. 3R Act, § 205(d), *currently codified at* 49 U.S.C. § 10362(b)(6) (Supp. III 1979).

In designating the RSPO's responsibilities, the 4R Act added another significant factor to be considered by the RSPO in promulgating the Standards. Section 205(d) of the 3R Act, as amended, provides, in pertinent part that the RSPO shall issue regulations which contain

> (A) standards for the computation of subsidies for rail passenger service ... which *are consistent with the compensation principles described in the final system plan and which avoid cross subsidization among commuter, intercity and freight rail services ....*

4R Act, § 309, *currently codified at* 49 U.S.C. 10362(b)(5)(A) (Supp. III 1979) (emphasis added). It is the interaction of Section 304(c)(2)(A) and Section 205(d) which frames the legal issue to be decided in this appeal.

---

**6.** If states or local transportation authorities had supported the operation of commuter services by subsidizing Conrail's predecessor railroads they were required to continue providing the same level of financial assistance during the 180 day period. 4R Act, § 804, *codified at* 45 U.S.C. § 744(e)(2) (1976). Where such reimbursement was not available or did not fully compensate Conrail, Conrail was entitled to reimbursement by the Urban Mass Transportation Authority. 4R Act, § 804, *codified at* 45 U.S.C. § 744(e)(5)(A) (Supp. III 1979).

**7.** The RSPO published a notice of proposed rulemaking on February 20, 1976, 41 Fed.Reg. 7793. On May 14, 1976, it published a further notice of rulemaking which included the proposed Standards. 41 Fed.Reg. 20104. In response, it received comments from Conrail, commuter railroads, Amtrak, state transporta-

tion departments, commuter authorities, local and governmental regional bodies, the United States Department of Transportation and the Office of Public Counsel. Thereafter, the RSPO made certain changes in the proposed Standards and on June 30, 1976 published a second further notice of proposed rulemaking which appeared in 41 Fed.Reg. 26936. The Standards were issued on August 3, 1976. 41 Fed.Reg. 32546.

**8.** The amendments to the Standards which are at issue herein have not yet been codified; they appear at 45 Fed.Reg. 45–47 (1980). Sections of the Standards which appear in 49 C.F.R. are cited in this opinion as "Standards, § X." Sections which appear in the Federal Register are cited as "Standards, § X, as amended."

Since April 1, 1976, Conrail has operated commuter rail service in the greater Philadelphia metropolitan area and surrounding areas on behalf of SEPTA. At that time, approximately 28% of the lines used in operation of SEPTA's commuter service were owned by Amtrak and that percentage has not appreciably changed during the period. On April 1, 1976, Conrail conveyed certain rail properties to SEPTA which related solely to operation of commuter service; they do not present the issue of cost allocation involved in this appeal. SEPTA, as a commuter authority, also had the right under the Rail Act to acquire certain other rail lines and facilities which had been conveyed to Conrail from the railroads that were bankrupt or in reorganization and which were used for commuter service but which were not designated for inclusion in the restructured rail system in the Final System Plan. 3R Act, § 206(c), (d)(5)(C), *currently codified at* 45 U.S.C. § 716(c), (d)(5)(C) (1976 & Supp. III 1979). The option to purchase within 900 days originally was scheduled to expire on September 18, 1978 but was extended to March 31, 1979. Pub.L.No.95–611, § 4(a), 92 Stat. 3090 (1978).

In determining whether to exercise its option to purchase, SEPTA was concerned whether ownership of the property would affect the amount of subsidy it had to pay to Conrail to insure continuation of the service. On June 7, 1978 SEPTA petitioned the RSPO for an interpretation of its Standards to clarify the effect of the proposed change in ownership from Conrail to SEPTA of a substantial portion of the rail facilities used in providing the SEPTA service. The RSPO handled SEPTA's request on an expedited basis and on August 15, 1978 issued Interpretation No. 9 in which it rejected SEPTA's proposed ·interpretation. Notwithstanding the RSPO's interpretation, on March 30, 1979 SEPTA purchased almost

200 route miles from Conrail which changed the ownership balance by increasing SEPTA's ownership from 8% to 56% of its commuter rail lines and decreasing Conrail's ownership from 64% to 16% of those lines. SEPTA then filed this petition for review challenging Interpretation No. 9 and the amendments to the Standards incorporating that interpretation.[9]

## IV.

## DETERMINATION AND ALLOCATION OF COSTS

Before considering the arguments of the parties, we must focus on the type of costs which are incurred in an interrelated railroad system furnishing freight, commuter and/or intercity passenger services.[10] There are four primary categories of costs: *solely related costs, directly attributable costs, variable common costs,* and *fixed common costs.* Those costs which are *solely related* are those expended exclusively for a particular service operated on that line. Examples of *solely related* costs are rentals of equipment, train crews, train fuel and power, train supplies, etc. Costs which are *directly attributable* are those portions or segments of costs which both services share but which are subject to a direct method of assignment because they can be identified as attributable to one particular service. An example would be the labor cost expended to repair a commuter car in a facility in which cars of another service are also repaired by a common pool of employees.

Obviously, allocation problems are substantially minimized to the extent that it is possible to identify costs as solely related or directly attributable to one type of service. For this reason, the RSPO has directed the development, to the maximum extent practicable, of directly identifiable and common costs. The parties are required to develop a

**9.** SEPTA, viewing Interpretation No. 9 as a final order of the RSPO, petitioned for its review in No. 78–2345. Following the amendment of the Standards, SEPTA again petitioned for review in No. 80–1237. The two petitions present the same issue, and were ordered con-

solidated; they are treated here as a single case.

**10.** *See generally* D. Locklin, *Economics of Transportation* 549–50 (7th ed. 1972) (discussing separation of freight and passenger expenses).

comprehensive facilities utilization plan itemizing the properties and equipment used and useful in providing the particular rail service and the percentage of use of facilities or equipment in providing that service. *See* Standards, § 1127.7(b), as amended. The RSPO also directed the development of a manpower utilization plan which identifies the labor forces used in providing the particular service by listing the persons employed according to job title, work location, account and percentage of time devoted to that service's duties. *Id.*, § 1127.7(c), as amended. Conrail and the subsidizer were required to conduct jointly all special studies required by the Standards. Standards, § 1125.7(d).

Those costs which are not subject to a direct method of assignment are by definition *common costs.* Common costs in turn can be separated into two categories, *variable common costs,* which vary according to the level of traffic or other type of usage, and *fixed common* or *base costs,* which will be incurred regardless of usage. An example of a fixed cost is a tower that controls the operations of certain power assisted switches. Other examples are upkeep of drainage systems, repairs of damage to tracks caused by weather conditions or vandalism, etc.

The RSPO has stated that the Commuter Subsidy Standards are guidelines, not mandatory rules to which the parties must adhere inflexibly. The Standards permit, and according to the RSPO encourage, the subsidizer and railroad "to establish a relationship uniquely suitable to them." 41 Fed. Reg. 32546 (1976). *See also* Standards, § 1127.3(d)(1). On the other hand, if no agreement is forthcoming, then the RSPO Standards are applicable. In the Standards, the RSPO has devised a detailed methodology for assignment of common variable costs in the event the parties are unable to agree. The Standards contain various formulae devised to apportion such costs between the different services, de-

pending on the specific type of costs involved. For example, the costs of roadway maintenance of running tracks are to be apportioned on the ratio of the commuter service Speed Factored Gross Tons (SFGT) for the designated area to the total SFGT for all traffic in the designated area.[11] *See* Standards, § 1127.7(f)(1)(ii), as amended. Costs of the roadway maintenance of way and structures of yard and way switching tracks are to be apportioned on the ratio of the commuter service cars dispatched in the designated area to the total cars dispatched in the designated area. *See* Standards, § 1127.7(f)(1)(i), as amended. On the other hand, the common costs assigned to fuel stations shall be apportioned on the ratio of fuel dispensed for commuter service to the total amount of fuel dispensed for all services using these facilities. *See* Standards, § 1127.7(f)(1)(vii).

The Standards do not allocate fixed common costs, those costs necessary for both passenger and freight services without regard to factors such as volume of traffic. It is that category of costs, also called *base costs,* which is the subject of the instant dispute between the parties.

The statute does not refer to the cost terms discussed above, although the Standards do. Instead, the relevant statutory cost term for purposes of this case is *avoidable cost.* All parties agree that in railroading *avoidable costs* are those costs which would not be incurred if a particular activity were eliminated. *See* Price & Berardino, *Defining Economic Terms Used in the Railroad Revitalization and Regulatory Reform Act,* 9 Transp.L.J. 133, 141 (1977). For the issue before us, avoidable costs are those costs which would not be incurred if the commuter service was not operated. They are, by definition, the converse of *base costs,* which are defined in the Standards as "all [non-avoidable] costs that are specifically related to a rail property and/or facili-

11. The Speed Factored Gross Tons formula is used to apportion certain costs between different services using a line. The formula is based on the weight of each service's trains, factored by the speed at which the trains travel, thus attempting to calculate the deterioration of the tracks caused by each service. *See* 49 C.F.R. Part 1127, App. III (1979).

ty." [12] The parties agree that SEPTA, as the subsidizer, is responsible for all costs which are solely related or directly attributable to commuter rail services. Additionally, they agree that SEPTA must pay its share of variable common costs, as computed according to various formulae not herein challenged. These three categories—solely related, directly attributable and variable common—are all costs which Conrail could avoid if it discontinued commuter rail services, hence they are clearly "avoidable costs."

The parties do not raise any issue of the components of any part of avoidable costs nor of the allocation of any part of a specific cost as avoidable. Instead, we must decide whether SEPTA's subsidy must be limited by the avoidable costs of its service, as it contends, or whether it must include all or any portion of the fixed common or base costs.

The Standards as originally promulgated did not make cost allocation dependent on ownership. The situation in which a commuter authority might purchase a line in which Conrail has common carrier responsibility for freight service was not addressed in the development of the Standards. The original Standards used terms such as "freight service" and "commuter service." In an abundance of caution, in 1978 SEPTA sought assurance from the RSPO that if it purchased the commuter lines made available for purchase by Conrail, the change in ownership would affect only the "return on value" component of its continuation payment and not the avoidable cost component. In response to SEPTA's request, the RSPO issued Interpretation No. 9. In its interpretation, the RSPO ruled that a change in the ownership of the rail property would affect the cost responsibilities of the parties. Specifically, the RSPO ruled that if a commuter authority purchased a line, the commuter service would become the dominant user and would bear the base costs associated with the line.

12. The RSPO has defined *base costs*, following promulgation of Interpretation No. 9, in terms of the presumption of usage which is the disputed issue in this appeal. The amendment to the Standards added the following definition:

The RSPO recognized that it had not previously used the concepts of "dominant" and "minority" users, which had been referred to in the Final System Plan. RSPO noted that in Interpretation No. 9, it had presumed that freight service would always be the dominant user, but explained that "[h]ad we exercised greater care in the initial drafting of these Standards, we would have framed them in terms of 'dominant' and 'minority' users . . . ." Interpretation No. 9 at 13, *reprinted at* A–101.

The RSPO relied in Interpretation No. 9 on the compensation principles established in the Final System Plan. The four cost-sharing principles which the United States Railway Association developed in the Final System Plan were:

First, Conrail has the responsibility to provide satisfactory passenger service on all lines in its system . . . . Second, the provision of those services should not be subsidized by freight services and Conrail should not be burdened with any passenger deficit. Third, passenger operations should have priority over freight operations. Fourth, *the exclusive or dominant user of a facility or in some special cases a state or public agency should be its owner.*

1 United States Railway Association, Final System Plan 40 (hereinafter cited as "1 FSP") (footnote omitted) (emphasis added). From these principles, the Final System Plan developed the following policies regarding ownership and allocation of costs:

Where facilities exist or are built for the exclusive use of one type of service, i. e., passenger or freight, that entity should bear the full cost of those facilities.

In instances where two or more passenger entities jointly use an exclusive passenger facility, the responsibility for allocating costs on an equitable basis should lie with the users.

"*Base costs*" means all costs that are specifically related to a rail property and/or facility, except those costs which could be avoided if the minority user(s) service(s) were not present." Standards, § 1127.1, as amended.

*Where freight and passenger operations both use a facility, the dominant user should own the facility and bear all the costs of that facility except those which could be avoided if the minority user were not present.* To determine the dominant user, all passenger services, both intercity and commuter, should be considered as one entity and all freight services, regardless of carrier, should be considered as one entity.

The minority user should bear exclusively the cost of any additional facilities it requires, both existing and proposed.

Where passenger and freight operations both use a facility on an equal basis, the costs of owning and using the facility should be shared equitably.

*Id.* at 41 (emphasis added).

In Interpretation No. 9, the RSPO focused on the Final System Plan principle that the dominant user of a facility should own the facility. Relying on this principle, the RSPO then made the presumption "that ownership of a facility is an indication by the owner that it is the dominant user of the facility." Interpretation No. 9 at 15, *reprinted at* A–103. It justified adoption of this presumption because of "the administrative impossibilities associated with trying to decide, on a line-by-line basis, which service is the dominant user and which is the minority user." *Id.* It noted that because some lines with nearly equal usage would constantly be changing from commuter-dominant to freight-dominant and back, the uncertainty of each party's cost liability could make the subsidy program unworkable. Finally, the RSPO determined that rulemaking was necessary to adequately develop the specific changes to the Standards to reflect the major conceptual issues resolved with its interpretation. Following the reopening of rulemaking on the Standards, on January 2, 1980, the RSPO revised the Standards to reflect this change.

Thus, after the issuance of Interpretation No. 9 and the amendments to the Standards reflecting that ruling, the cost allocation underlying the commuter authority's subsidy to Conrail is as follows: "Unless the parties agree otherwise, the subsidizer . . . shall be assigned the directly identifiable and common costs, *including base costs* as applicable, of providing the commuter passenger service." Standards, § 1127.3(d)(2), as amended (emphasis added). The assignment of base costs to the subsidizer is accomplished through the requirement that "[t]he base costs shall be assigned to the dominant user." *Id.*, § 1127.7(a), as amended. The "dominant user" is defined in the Standards as the owner of a rail property, relying on the presumption to that effect established in Interpretation No. 9. *Id.*, § 1127.1, as amended.

## V.

## CONTENTIONS OF THE PARTIES

SEPTA claims that the imposition on it of all of the base costs pursuant to a presumption that it is the dominant user is unauthorized and controverts the statutory scheme that it pay only avoidable costs. SEPTA relies on § 304(c)(2)(A) which expressly provides that the subsidizer is entitled to continued service so long as it offers to pay Conrail the difference between the revenues attributable to the subsidized service and the "avoidable costs of providing" such service. Therefore, SEPTA reasons Congress must have contemplated that it was Conrail which must pay those other costs associated with the railroad properties which could not be avoided if there were no commuter service. It argues that its payment of avoidable costs is both a necessary and sufficient condition to compel Conrail's operation of its lines. The requirement that subsidizers pay base, i. e. fixed, costs if they own the properties even if Conrail uses those lines to haul interstate freight is inconsistent with that legislative purpose. Furthermore, SEPTA argues that the requirement that it pay all base or fixed costs constitutes "cross-subsidization" by the commuter lines of the freight lines, in violation of the statutory proscription of such cross-subsidization embodied in § 205(d)(5). Finally, SEPTA contends that the RSPO's Interpretation No. 9 assigns costs to it based on its status as owner, without authority to

do so under the legislation and contrary to the Final System Plan which recommended cost sharing on a usage, not status, test.

The RSPO responds that SEPTA errs in reading § 304(c)(2)(A) in isolation. Instead, it argues that this section must be read in conjunction with two other sections, § 304(e) which provides that to ensure the continuation of commuter service, a subsidy must not only meet the requirement of § 304(c)(2)(A) but must also conform with the Standards issued by the RSPO under § 205(d)(5), and § 205(d)(5) which instructs the RSPO to issue standards that are consistent with the compensation principles of the Final System Plan and which avoid cross-subsidization among commuter, intercity passenger, and freight service. It argues that it merely incorporated into the Standards the policy of the Final System Plan that the dominant user of a facility should own the facility and bear the base costs and that the presumption imposed by Interpretation No. 9 has a valid administrative rationale. It reads the legislative history as a rejection by Congress of the "strictly avoidable" cost concept urged by SEPTA. Finally, it argues that since the terms "avoidable costs" and "cross-subsidization" are not defined in the statutes, but rather Congress delegated to it the authority to "give meaning" to these terms, its actions in this regard are entitled to highly deferential treatment.

Conrail supports the RSPO's actions, citing to the legislative history to support the proposition that "Congress' ultimate goal was for costs to be shared on an equitable basis by all users of a given line." Conrail's brief at 13.

## VI.

## DISCUSSION

■ Initially, we must meet SEPTA's contention that its obligation is governed only by the avoidable cost concept of § 304(c)(2)(A). SEPTA recognizes that the language of § 304(e)(4) can be read to expressly incorporate the RSPO's obligations pursuant to § 205, which in turn refers to the principles of the Final System Plan and avoidance of cross-subsidization. That section provides:

(4) If a state (or a local or regional transportation authority)—

(A) offers a rail service continuation payment, pursuant to subsection (c)(2)(A) of the section and under regulations issued by the Office [RSPO] pursuant to section 205(d)(5) of this Act [now 49 U.S.C. § 10362(b)(5)] for the operation of rail passenger service after the 180-day mandatory operation period, and

(B) provides compensation pursuant to paragraph (2) of this subsection, for operations conducted during the 180-day mandatory operation period,

the Corporation [Conrail] ... shall continue to provide such service after the end of such period ....

SEPTA would have us disregard § 304(e)(4)(A) on the theory that this latter section, which had been added by the 4R Act, "was a last-minute amendment to the Act designed to dovetail with another last minute amendment embodied in the 4R Act, a new section (§ 17) to be added to the end of The Urban Mass Transportation Act of 1964." SEPTA's brief at 14. Section 17 provided for reimbursement by the Urban Mass Transportation Authority for those subsidizers which complied with § 304(e)(4) and thus limited reimbursement by emergency assistance funding to those commuter authorities which had paid subsidies to Conrail both during the 180 day mandatory period and during the period thereafter.[13]

We recognize that the clear intent of § 304(e)(4) (which had been added by the 4R Act) is difficult to decipher since it both explicitly incorporates § 304(c) which had

---

13. Section 17 of the Urban Mass Transportation Act, like subsection (e)(4) of section 304, was enacted as part of the 4R Act. Section 17 provides, in relevant part, that "[t]he Secretary shall provide financial assistance for the purpose of reimbursing ... States, local public bodies, and agencies thereof for additional costs incurred by such States, bodies, and agencies with respect to rail passenger service required by section 304(e)(4) of the Regional Rail Reorganization Act of 1973 [45 U.S.C. § 744(e)(4)]." 49 U.S.C. § 1613(a)(2) (1976).

been part of the 3R Act and yet at the same time adds requirements which are arguably inconsistent with that section. SEPTA attempts to explain the obvious redundancy between the two sections, both of which purport to state when Conrail is required to provide continued service, by limiting § 304(e)(4) to the subcategory of cases where payments mandated by § 304(c)(2) have been offered *and* where the compensation required during the 180 day mandatory period has been provided. The difficulty with SEPTA's argument is that the language of § 304(e)(4) does not contain the limitation SEPTA ascribes to it,[14] nor can SEPTA point to anything in the legislative history to support its theory.

We find an even more fundamental difficulty with SEPTA's contention. Apparently, SEPTA attempts to brush aside § 304(e)(4) because that section expressly connects the required subsidy payment to the RSPO's authority under § 205 to promulgate Standards in accordance with the principles of the Final System Plan and the principle of avoidance of cross-subsidization. However, even were § 304(e)(4) inapplicable to the computation of subsidies for continuation of service, it would not follow that § 205 would also be inapplicable in determining the principles to be used in computation of the subsidies. Section 205 is the cornerstone of the RSPO's authority generally applicable to computation of subsidies since it directs the RSPO to issue regulations containing "standards for the computation of subsidies for rail passenger service ... which are consistent with the compensation principles described in the final system plan and which avoid cross subsidization among commuter, intercity and freight rail services." It reflects congressional intent that the principles described in the Final System Plan should not be disregarded when the amount of the subsidy is determined. Therefore we agree with the RSPO and Conrail that in allocating the costs which determine the amount of the required subsidy, § 304(c)(2) cannot be considered in a vacuum as the only relevant provision.

The legislative history confirms that Congress recognized the possibility of conflict between the principle that commuter railroads should pay only the avoidable cost and the principle against cross-subsidization, and chose to elevate the prohibition of cross-subsidization. In 1975, while considering the legislation which would emerge as the 4R Act, Senator Harrison Williams and Congressmen James Howard and James Florio, all representing New Jersey, proposed that commuter subsidies be limited to the avoidable cost concept, as they had been in the 3R Act.[15] *See* S.Rep.No.585, 94th Cong., 1st Sess. 187–88 (1975). Those proposals were incorporated into the House version of the 4R Act. H.R.Rep.No.725, 94th Cong., 1st Sess. 48 (1975). The Senate bill differed, using language referring to the compensation principles established in the Final System Plan and to the avoidance of cross-subsidization. The final Conference Report retained the Senate approach. S.Rep.No.595, 94th Cong., 2d Sess. 226–27

---

14. A similar problem of statutory interpretation was considered in *Illinois v. Consolidated Rail Corp.*, 589 F.2d 1327 (7th Cir. 1978), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2884, 61 L.Ed.2d 312 (1979) because the 4R Act reenacted § 304(a) but also added § 304(e) which are arguably inconsistent. The court, commenting that "[t]o say the least, this results in an ambiguity," stated that in resolving the potential conflict, "it is reasonable to insist on the use of language which would show that Congress has made a considered determination" that language in the statute is void. *Id.* at 1331. The legislative draftsmanship reflected. in the 4R Act was described by the dissent in the same case as "an enactment ... poorly drawn." *Id.* at 1334. To the same effect, *see* the critical comments in Adams, *Railroad Revitalization and Regulatory Reform Act of 1976—An Interim Review*, 32 Bus.Law. 975, 978 (1977); Spencer, *The 4R Act, The New Rules of Practice, and Regulatory Lag: What is Missing?* 44 ICC Prac.J. 319 (1977).

15. When the 3R Act was under consideration, the House had proposed that commuter authorities pay full distributed costs, H.R.Rep.No. 620, 93d Cong., 1st Sess. 11–12 (1973), but the Senate version, adopting the avoidable cost concept, prevailed. *See* H.R.Rep.No.744, 93d Cong., 1st Sess. 62–63 (1973) (Conference Report), *reprinted in* [1973] U.S.Code Cong. & Ad.News 3306, 3326–27.

(1976) (Conference Report), *reprinted in* [1976] U.S.Code Cong. & Ad.News 148, 241–42. The RSPO has reviewed the legislative history and concluded:

> It is clear that both concepts were before the Committee of Conference and that the strict avoidable cost concept was not adopted. The references to the legislative proposals of Senator Williams and Congressmen Howard and Florio are omitted from the final Conference Report on S. 2718. Thus, it is reasonable to infer that Congress expected the Office not to confine itself to the strict avoidable cost principle advocated by NJDOT.

41 Fed.Reg. 26936 (1976). We agree with the RSPO that it was not only authorized but compelled to promulgate its Standards so as to avoid cross-subsidization.

That conclusion would assist us in evaluating the presumption embodied in Interpretation No. 9 only if imposition of base costs on the commuter authorities was consistent with the principle of avoidance of cross-subsidization. The difficulty is that application of that principle offers no assistance in the present inquiry. It proves either too much or too little when applied to fixed common costs which are, by definition, essential to the operation of either service without regard to whether there is another service using the same line. If the commuter authority is required to pay all fixed common costs, Conrail would (to use an apt vernacular expression) be getting a free ride. The converse would also be true were the fixed common costs imposed on Conrail. In one sense, the service required to pay the full fixed costs is subsidizing the other user, since the latter is not paying costs it would have to assume were it the only user. On the other hand, the service which must pay those costs is not paying any more than it would be required to pay were it the only user.

The RSPO attempts to justify the presumption embodied in Interpretation No. 9 as merely incorporating the policy of the Final System Plan to which the RSPO is required to adhere. The principles and policies of the Plan which the RSPO relies on provide as follows:

> [T]he exclusive or dominant user of a facility or in some special cases a state or public agency should be its owner. (principle)
>
> \*  \*  \*  \*  \*  \*
>
> Where freight and passenger operations both use a facility, the dominant user should own the facility and bear all the costs of that facility except those which could be avoided if the minority user were not present. (policy)

1 FSP 40–41. It is evident that the Final System Plan recommended that ownership attend dominant use. It does not follow that the Plan's *recommendation* that dominant users purchase rail lines can be transmuted into an *irrebuttable presumption* that the purchasers are in fact the dominant users. As SEPTA notes there may be other reasons, some of them resulting from the local political situation, which might have impelled a commuter authority to purchase the facilities when they became available, even though the authority may not have been the dominant user on all such facilities. The situation where the owner of the facilities is not in fact the dominant user was not resolved in the Final System Plan [16] and therefore its principles and policies do not direct the presumption adopted by the RSPO.

The RSPO then resorts to two final bases to justify its presumption. It relies on the delegation of authority to it by Congress, which it claims warrants our deference to its interpretations. Certainly the principle that courts must defer to agency expertise is deeply rooted in our jurisprudence. In

---

**16.** The only discussion of this issue in the Final System Plan occurs in the course of a discussion of the policies set forth in the Preliminary System Plan. In explaining those policies, subsequently slightly modified, there is a reference to the possibility that a passenger entity might choose not to own or lease a predominantly passenger facility, in which case it was suggested that Conrail, as the owner, would be compensated for all but its avoidable costs. 1 FSP 40.

this instance, however, Congress has not delegated to the RSPO the broad discretion to make rules necessary to protect the public interest or to fill in statutory interstices which it has done in connection with other administrative schemes. *Cf.* 15 U.S.C. § 78j (1976) (Securities and Exchange Commission empowered to prescribe rules and regulations "as necessary or appropriate in the public interest"); 45 U.S.C. §§ 501, 562(a) (Supp. III 1979) (Interstate Commerce Commission to fix "just and reasonable" compensation in contracts between Amtrak and other railroads); 47 U.S.C. § 303(r) (1976) (Federal Communications Commission empowered to issue rules and regulations as "public convenience, interest, or necessity requires"). The RSPO's authority derives from the statutory directive that it promulgate standards which avoid "cross-subsidization" and define "avoidable costs" as those terms are used in the statute. As we note in our opinion in *SEPTA II* decided today, we do not believe that the RSPO's powers should be given an unduly restrictive construction; neither do we believe there is any language or legislative history which would justify expansion of its powers to general administration of the statutory scheme. Instead, under the statutory language relevant here, it is apparent that the RSPO standards must be guided at all times by congressional intent as it can be inferred from the legislative history in the absence of specific statutory language.

We find little merit in the RSPO's final justification of administrative necessity for imposition of the presumption that ownership and dominant usage are correlative. The RSPO's entire cost methodology presupposes the feasibility of ascertaining the extent of usage. All of the common variable costs are assigned in this manner, although the measuring device for usage varies with the particular cost. There is no reason why an allocation methodology cannot be devised with respect to fixed costs. We recognize the validity of the RSPO's point that the dominant user on a particular line may shift, but this would not prevent an annual or semi-annual determination of dominant usage rather than a fixed presumption keyed solely to ownership.

There is one significant omission to which the parties have given too little attention. That omission is the absence of any attempt, at least on the record, of ascertaining the facts with respect to usage of the facilities in question. We simply do not know whether Conrail or SEPTA is the dominant user on all or part of the facilities, or whether their usage is in fact so nearly equal as to create an administrative difficulty in denominating either as the dominant user. In any event, the RSPO presumption is not based on any evidence as to usage, and therefore may be contrary to the actual situation of usage. The presumption itself appears to be irrebuttable, because there is no provision for proving to the contrary. When asked about this at oral argument, the RSPO's attorney replied that the situation in this regard is "unclear."

SEPTA argues with considerable persuasion that imposition of all the fixed costs on it as the owner is more onerous than requiring it to pay its share of the fully distributed costs. The RSPO has acknowledged that the legislative history of the 3R Act indicates Congress did not intend to impose on the subsidizers a share of the fully distributed costs. *See* note 15, *supra.* It is unclear whether that congressional intent was carried over when the amendments embodied in the 4R Act were made.

It would have been of great assistance had the statutory language been clearer with respect to the underlying policies to be followed by the RSPO in its promulgation of standards relating to the amount of subsidy to be paid by the commuter authorities. There are different and possibly varying language which can be used to support contradictory inferences. There does, however, appear to have been one paramount legislative concern reflected in both the House and Senate Reports, and that was that costs should be allocated according to principles

of fairness and equity. The Senate Report explicitly stated:

> [T]he standards will reflect the relative use of any line by the type of service being provided thereon and *will also provide that the costs will be shared equitably by the users of any individual line.*

S.Rep.No.499, 94th Cong., 1st Sess. 114 (1975) *reprinted in* [1976] U.S.Code Cong. & Ad.News 14, 130 (emphasis added). *See also* H.R.Rep.No.725, 94th Cong., 1st Sess. 95 (1975) using almost identical language. Indeed, the same concepts of equitable sharing were adopted in the Final System Plan which provides that "[w]here passenger and freight operations both use a facility on an equal basis, the costs of owning and using the facility should be shared equitably." 1 FSP 41.[17] The presumption embodied in Interpretation No. 9 is inconsistent with the congressional intent reflected in the Senate Report in two respects: it may not reflect the relative use on the line by the type of service being provided, and its imposition of all of the fixed costs on the owner, irrespective of the amount of usage by another service, does not accord with notions of equitable sharing. Promulgation of a presumption dependent only on ownership without any evidence of usage was both contrary to law and constituted an abuse of discretion.

We therefore hold that the irrebuttable presumption that the owner is the dominant user cannot be maintained.[18] We specifically do not decide whether the RSPO may, if it deems it appropriate, impose the entire amount of base costs on one user. The RSPO may determine that such imposition is the only feasible method of allocating such costs. We only decide that if it decides to do so, it may not do so on the basis of an irrebuttable presumption of usage unrelated to any supporting evidence. Furthermore, the RSPO will be free to reconsider whether some apportionment of base costs among the users will be most consistent with the congressional intent.

Accordingly, we will remand this matter to the RSPO for further consideration.

17. As the RSPO acknowledges, "significant users share common costs equitably while insignificant users pay their direct costs plus a negotiated allowance for overhead." RSPO brief at 6. The RSPO brief does not cite to the Standard which it believes adopts this equitable sharing concept. Presumably, the equitable sharing to which RSPO refers in its brief is of common variable costs allocated by usage. The RSPO has not adopted that approach for fixed or base costs.

18. The unambiguous language of the Standard provides that "*Dominant user*' means the person, railroad, State, or local or regional transportation authority who is the owner of a rail property and/or facility." Standards § 1127.1 as amended. The RSPO has not suggested that the presumption that the owner is the dominant user can be rebutted. Further, it has not established any mechanism by which the owner/commuter authority could demonstrate to the contrary. Nothing in this opinion is intended to suggest that its adoption of a rebuttable presumption based on ownership would be in-

valid. We believe it is appropriate to leave to the agency, in the first instance, the decision whether to establish such a presumption and, if so, to decide on the appropriate procedure for rebuttal. This would necessitate a determination of what measure should be used to determine usage for this purpose, the percentage of use which would constitute dominance, the period for which such a determination would be made, and the manner in which the conclusion as to usage would be integrated into the procedure for determination of the appropriate subsidy. The RSPO had originally proposed to define "significant use" as use of 10% or more of total train time on line. 41 Fed.Reg. 20111 (1976). After receiving comments that questioned the use of percentages and the selection of train time as the sole measure, the proposed definition was withdrawn. 41 Fed.Reg. 26937–38 (1976). This graphically illustrates the complexity of the issues to be considered before the RSPO decides whether to establish any rebuttable presumption.